IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Committed Intimate Relationship of | No. 86399-1-I |
| MARC COLUCCIO, | DIVISION ONE |
| Respondent, | UNPUBLISHED OPINION |
| and | |
| ILYANA KHANLAROVA, | |
| Appellant. | |

DÍAZ, J. — In 2022, Marc Coluccio petitioned for termination of his committed intimate relationship (CIR) with Ilyana Khanlarova. Following a bench trial, the court issued its final orders, including a parenting plan and a division of the couple's property. Khanlarova now argues the court abused its discretion in setting the CIR start date it chose, in ordering RCW 26.09.191(3) parenting restrictions against her, and in dividing their property. Khanlarova further claims the court failed to accommodate her disabilities at trial and requests attorney fees on appeal. We affirm the court's final orders and deny fees.

I.     BACKGROUND

Khanlarova is a refugee who moved to the United States from the Soviet

Union around the time of its collapse. The parties initially met in 2002 and dated for a few months before parting ways.

The parties started dating again in 2008. In 2009, Coluccio moved to Europe to pursue an MBA. In 2010, he returned to the United States and moved to Khanlarova's condo as he was still renting out his house. In 2011, Coluccio proposed to Khanlarova. In 2012, the parties moved to a home in Seattle's Madrona neighborhood. Two years later, Khanlarova gave birth to S.C.,[1] the parties' first child. In 2016, the parties sold the Madrona house and moved to a home in Bellevue. That same year, Khanlarova gave birth to R.C., the parties' second child.

On August 23, 2022, Coluccio petitioned for termination of the CIR. A bench trial began in December 2023. Khanlarova proceeded pro se, while Coluccio was represented by counsel.

At trial, the court admitted a report and heard testimony from a parenting evaluator, Dr. Jennifer Wheeler. The court also heard testimony and admitted related evidence from Kelly Deis and Steve Kessler, Coluccio's financial experts, as well as Joseph Winkler, Khanlarova's financial expert.

In February 2024, the court entered three final orders. First, the court issued a "Final Order Ending a Committed Intimate Relationship (CIR)," which primarily divided the parties' property, including their Bellevue home, investments, and retirement accounts. Second, the court issued a "Parenting Plan" which, among other provisions, imposed RCW 26.09.191(3)(b) restrictions on Khanlarova

---

[1] We use the initials of the parties' two children to protect their privacy.

for an "emotional or psychological problem that impairs her ability to parent." Finally, the court issued findings of fact, supporting the two orders above.

Khanlarova unsuccessfully moved for a new trial and reconsideration, and now timely appeals through counsel.[2]

## II.    ANALYSIS

### A.    Standards of Review on Khanlarova's Abuse of Discretion Claims

Khanlarova claims the court abused its discretion in three ways.  First, she claims the court abused its discretion when it did not find that the CIR started when the parties cohabitated or on the date of Coluccio's marriage proposal.  Second, she claims the court abused its discretion when it imposed RCW 26.09.191(3) parenting restrictions against her.  Finally, she claims the court abused its discretion by the manner in which it divided the parties' property.  Such claims are governed by the following standards.

"'A trial court abuses its discretion if its decision is manifestly unreasonable, adopts a position *no reasonable judge* would take, is 'based on untenable grounds,' or if the judge misapplied the law." *In re Committed Intimate Relationship of Muridan & Redl*, 3 Wn. App. 2d 44, 54, 413 P.3d 1072 (2018) (emphasis added) (quoting *In re Parenting & Support of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016)).

To be based on tenable grounds, a court's findings must be supported by substantial evidence "'defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true.'"  *In re Custody of A.T.*, 11 Wn.

---

[2] Khanlarova's appellate counsel withdrew after oral argument before this court.

App. 2d 156, 162, 451 P.3d 1132 (2019) (quoting *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003)). "The party claiming error has the burden of showing that a finding of fact is not supported by substantial evidence." *Id.*

In gauging substantial evidence, "[w]e will not substitute our judgment for the trial court's, weigh the evidence, or"—most relevant here—"adjudge witness credibility." *In re Marriage of Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999). This deference also extends to expert testimony as the "factfinder," here the court below, "is given wide latitude in the weight to give expert opinion" as appellate courts may not engage in "weighing expert testimony." *In re Marriage of Sedlock*, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993).

Thus, "[e]*ven where the evidence conflicts*, the appellate court need determine only 'whether the evidence most favorable to the prevailing party supports the challenged findings.'" *State v. Living Essentials, LLC*, 8 Wn. App. 2d 1, 14, 436 P.3d 857 (2019) (emphasis added) (quoting *Prostov v. Dep't of Licensing*, 186 Wn. App. 795, 820, 349 P.3d 874 (2015)).

1. CIR Start Date

Khanlarova now argues the "court abused its discretion in arbitrarily picking March 28, 2014 as the start date of the CIR and ignoring the parties['] previous four years of living together" and, alternatively, their engagement in 2011. We disagree.

"A CIR is a 'stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist.'" *Muridan*, 3 Wn.

4

App. 2d at 55 (quoting *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995)); *In re Matter of Kelly & Moesslang*, 170 Wn. App. 722, 737, 287 P.3d 12 (2012) ("'Marital-like' is simply an attempt by the courts to describe the long-term, committed nature of a CIR") (quoting *In re Marriage of Pennington*, 142 Wn.2d 592, 601, 14 P.3d 764 (2000)).

"Relevant factors establishing a [CIR] include, but are not limited to: continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects, and the intent of the parties." *Connell*, 127 Wn.2d at 346; *In re Parentage of G.W.-F.*, 170 Wn. App. 631, 648, 285 P.3d 208 (2012) (highlighting that "there must be '*mutual intent* to form'" and "maintain" the CIR) (emphasis added). In *Pennington*, our Supreme Court held that one factor "is not more important than the other" as the factors intend "to reach all relevant evidence helpful in establishing whether a [CIR] exists." 142 Wn.2d at 602, 605. Further, "[c]ourts should not apply these factors in a hypertechnical fashion, but must base the determination on the circumstances of each case." *Muridan*, 3 Wn. App. 2d at 55.

Here, the trial court did not abuse its discretion in finding that a CIR existed or when it began. It rightly held that there are "a number of factors that are taken into account" and "[c]ohabitation is . . . important, but it's not the only factor." And it found that, after it "considered the totality of evidence and all relevant factors . . . the CIR began on March 28, 2014, when the parties executed legal documents to solidify their relationship" as their "prior cohabitation and mere engagement planning (without proceeding to a wedding or marriage) did not rise to that level in

this case." The legal documents to which the court was referring were the wills and powers of attorney the parties established for one another, in which they "referred to one another as partners." Those documents constitute supporting substantial evidence. In *Muridan,* this court similarly found an "affidavit of domestic partnership" evidenced an intent for a CIR.[3] 3 Wn. App. 2d at 57, 60.

Moreover, "a rational, fair-minded person" could be persuaded that—as the court found—these legal documents, when contrasted with other evidence, indicates a lack of mutual intent to form a CIR before March 28, 2014. *Muridan*, 3 Wn. App. 2d at 54-55. For example, Coluccio provided undisputed testimony that "pretty quickly" after their 2011 engagement "the talk turned into we're not going to have a wedding, we're not going to get married." Specifically, Coluccio explained that he "started having some doubts" due to friction between Khanlarova and his family "that was causing [him] a lot of heartache" as well as Khanlarova's rigid obstinance which left room for "no compromise" or "discussion" about various issues.

Further, Coluccio purchased the Madrona home in 2012 solely under his name and with his own funds. This purchase is notable when contrasted with the parties' 2016 joint purchase of the Bellevue home using both of their funds and under both of their names.

We thus hold that substantial evidence supports the court's decision to give greater weight to the parties' March 28, 2014 legal documents than their prior

---

[3] While the court there found the CIR commenced when the parties began cohabitating, the question of *when* the CIR began in that case was not before us as it is here. *Muridan*, 3 Wn. App. 2d at 50.

cohabitation or the engagement. *Muridan*, 3 Wn. App. 2d at 54-55. We need not reach the other factors as the parties do not rigorously analyze them. At best for Khanlarova, the court's decision here is similar to *Pennington*, where the "facts [were] too equivocal to conclusively establish that the parties mutually intended to be in a [CIR]" despite the parties' previous cohabitation and engagement. 142 Wn.2d at 595, 597, 606. In turn, Khanlarova failed to establish the court "'adopt[ed] a position no reasonable judge would take'" when it set the CIR start date in March 2014. *Muridan*, 3 Wn. App. 2d at 54 (quoting *L.H.*, 198 Wn. App. at 194).

2. RCW 26.09.191(3) Restrictions

The court's parenting plan imposed RCW 26.09.191(3)(b) restrictions against Khanlarova for "a long-term emotional or psychological problem that impairs her ability to parent." The parenting plan thus limited, but did not eliminate, her decision-making authority and residential time with her two children, R.C. and S.C. The parenting plan further required Khanlarova undergo mental health treatment for at least two years.

"Trial courts have broad discretion to create parenting plans tailored to the needs of the individuals involved in a particular dissolution. This discretion promotes finality, preventing 'extended litigation [that] can be harmful to children.'" *In re Marriage of Chandola*, 180 Wn.2d 632, 658, 327 P.3d 644 (2014) (alteration in original) (quoting *In re Parentage of Jannot*, 149 Wn.2d 123, 127, 65 P.3d 664 (2003)). Due to the importance of this "finality," the party "who challenges such decisions,'" here Khanlarova, "'bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court." *In re Marriage of Landry*, 103

7

Wn.2d 807, 809–10, 699 P.2d 214 (1985).[4]

Khanlarova makes two overarching challenges to the court's RCW 26.09.191(3)(b) restrictions. First, she argues the parenting evaluator's investigation on which the court relied was deficient in several ways. Second, and more generally, she alleges the court improperly imposed RCW 26.09.191(3)(b) limitations because its findings failed to identify any "actual harm" to the children and due to a lack of substantial evidence. We address each argument in turn.[5]

a. Khanlarova's Challenge of the Parenting Evaluation

The trial court appointed Wheeler as parenting evaluator in September 2022. Wheeler ultimately provided the court with a 51-page parenting evaluation with two appendices of collateral interviews, which was admitted into evidence and is not challenged here. Wheeler's evaluation contains a considerable amount of

---

[4] The standard announced in *Landry* was reiterated in *In re Marriage of Kim*, which addressed a parent's petition to relocate their children. 179 Wn. App. 232, 235-36, 317 P.3d 555 (2014). That said, this court reiterated the *Landry-Kim* standard in unpublished matters regarding the establishment of parenting plans, including *In re Marriage of Christopher*, which also addressed RCW 26.09.191 restrictions. No. 54208-1-II, slip op. at 18-19, 24-25 (Wash. Ct. App. Nov. 2, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054208-1-II%20Unpublished%20Opinion.pdf. We utilize this unpublished matter under GR 14.1 as it is "necessary for a reasoned decision" by providing an on-point example of utilizing the *Landry-Kim* standard for the establishment of a parenting plan.

[5] Khanlarova also presented numerous other claims, including discrimination under WAC 246-924-445; that Wheeler failed to properly consider her disabilities; that the parenting plan contains an unlawful "'successful co-parenting'" provision; and that the court violated her constitutional rights as a parent. We do not address them further here as they are insufficiently argued. *Palmer v. Jensen*, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration"); *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) ("Parties raising constitutional issues must present considered arguments to this court"). Regardless, each argument is contrary to the facts in the record.

information which includes, but is not limited to, a methodical retelling of both parents' accounts of events, both parents' psychological evaluations, both children's accounts of events, Wheeler's parent-child observations, as well as collateral interviews with the parties' personal and third-party professional contacts.

Wheeler's evaluation also conducted a lengthy and multi-factor RCW 26.09.191 analysis for each parent based on the parties' expressed concerns. Ultimately, Wheeler concluded that, "until such time that [Khanlarova] has benefited from additional therapeutic intervention, it is the opinion of the undersigned that there is a basis for some restrictions to the residential schedule under RCW 26.09.191, for 'emotional abuse' of the children, 'long-term emotional impairment,' or other factor which negatively impacts her performance or parenting functions."

Specifically, Wheeler also explained "[Khanlarova]'s anxiety appears to manifest in a combination of some adaptive protective behaviors, but also some overly protective and anxious-controlling behaviors."  In other words, "[w]hile the *intent* of [Khanlarova]'s anxious-controlling behaviors may be to protect the children from potential harm, the *impact* of her behaviors appear to be unduly extreme and harmful to the children's immediate and long-term emotional well-being."  She adds that the "mother has historically maintained an extremely negative, adversarial orientation towards father's family members" and has "cut[] off their access to the children."

Khanlarova does not specifically dispute Wheeler's above findings but

instead first argues that, by "not investigating safety concerns with Grace Ellen," Coluccio's mother, "Dr. Wheeler failed to fulfill her mandate as parenting evaluator" as a "person who assaulted their own mother could reasonably be seen as a risk of safety to the children." In support, Khanlarova relies on two domestic violence protection orders entered against Grace Ellen. Khanlarova's reliance on these orders is contrary to other facts in the record and contrary to Wheeler's unchallenged opinions.

For example, Wheeler explained that "[Khanlarova]'s negative characterization of [Coluccio]'s family are not supported by her own supporting documents or some of her own behaviors (e.g., seeking Grace's assistance in providing childcare after their nanny departed in September 2022)," a fact that Khanlarova does not specifically dispute.

Khanlarova next argues Wheeler improperly "relied almost entirely on hearsay." We disagree. While "parents 'should not be deprived of their parental rights on hearsay,'" an exception to ER 802 "allows an expert to share the hearsay facts supporting their expert opinion to explain how they reached that decision" under ER 703 and 705. *In re Dependency of A.C.*, 1 Wn.3d 186, 192, 525 P.3d 177 (2023) (citation omitted) (quoting *In re Welfare of Ross*, 45 Wn.2d 654, 655-56, 277 P.2d 335 (1954)). Further, WAC 246-924-445(5)(b) and (e) expressly allow parenting evaluators to consider "[c]ollateral contact interviews" or "[w]ritten input from collateral sources." And, as referenced above and discussed below, Wheeler based her evaluation on a significant amount of direct interviews with and

observations of the parties and their parenting.

Even assuming there was a hearsay issue, our Supreme Court held in the context of a parenting plan with RCW 26.09.191(3) restrictions, that "in a bench trial, the court is presumed to disregard improper evidence when making its findings." *In re Marriage of Katare*, 175 Wn.2d 23, 31-32, 40 n.8, 283 P.3d 546 (2012). Thus, this argument fails.

Khanlarova next argues Wheeler's above conclusions were supported by insufficient evidence, namely, because Wheeler did not "personally observe any meaningful 'authoritarian' parenting practices." We disagree.

As detailed in Wheeler's evaluation, she relied on a multitude of evidence including but not limited to 13.2 hours of interviews with Khanlarova, 1.4 hours of observing Khanlarova's parenting, 1.1 hours of interviews with S.C., collateral interviews with Khanlarova's mental health providers, and collateral interviews with the children's therapist, tutor, and nannies.

Thus, in line with WAC 246-924-445(5)(a), Wheeler gathered information from numerous sources with direct insight on Khanlarova's mental health and parenting style. Khanlarova's generalized arguments fail to meaningfully or substantively dispute of the reliability of these sources. *Cowiche Canyon Conservancy v. Bosley*,118 Wn.2d 801, 819, 828 P.2d 549 (1992) (the court is not required to search the record to locate the portions relevant to a litigant's arguments).

Even assuming arguendo Wheeler never personally saw Khanlarova's "'authoritarian'" parenting style, Khanlarova cites no authority specifically requiring

11

such a direct observation. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none"). If anything, WAC 246-924-445(5) suggests otherwise by granting broad discretion as to what parenting evaluators can consider, including collateral interviews.

Regardless, Wheeler and the court received direct evidence that a rational person could view as showing Khanlarova's "'authoritarian'" parenting style. This evidence included a video which shows Khanlarova repeatedly and significantly raising her voice while grabbing S.C. before physically tossing a crying S.C. on a sofa. Khanlarova's brief acknowledges this video in passing but otherwise fails to specifically address its contents.

We thus hold Khanlarova failed to establish Wheeler's investigation was one that "no reasonable judge would have" relied on. *Kim*, 179 Wn. App. at 240.

b. Khanlarova's Challenge of the RCW 26.09.191 Restrictions

Khanlarova next challenges the court's RCW 26.09.191(3) findings, which she claims failed to identify any "actual harm" she caused her children. We disagree.

On its face, this assertion is contrary to Khanlarova's own briefing, which acknowledges the "court based its decision to impose .191 limitations on Khanlarova because she denied visitation with the children's paternal grandparents and others."

More substantively, Khanlarova's assertion is also contrary to the record.

When the court imposed RCW 26.09.191(3) restrictions, it found its "most important concern was that Khanlarova is "cutting off the children from significant relationships in their lives" such as "their long-time nanny and family members," which "rises to the level of a .191 finding for a psychological or emotional problem that interferes with parenting."  It explained the "evidence at trial, including [Coluccio's] persuasive testimony . . . reflected" Khanlarova's "greater concern over parental control than for the well-being and interests of the children."

The court further acknowledged that Khanlarova "might have had legitimate concerns about the way [Coluccio's] family members communicated with" her, but "the Court finds that [Khanlarova's] reactions and demands were and are well beyond what could be justified."  The court also elaborated that "the testimony and documentary evidence established the children have very positive relationships with [Coluccio's] family, including [Coluccio's] mother, and the family is actively involved in their lives."  Thus, Khanlarova's abrupt ending of a "very significant and important relationship for the children . . . reflected a greater concern over parental control than for the well-being and interests of the children" and thus mandated RCW 26.09.191(3) restrictions.

Far from being generalized, the court engaged in a methodical, step-by-step explanation on how Khanlarova's actions harmed the children's emotional well-being, namely cutting them off from significant relationships.

Thus, it is simply contrary to the record to claim the court failed to "identify any actual harm."  It is also immaterial that the court separately found the children were "'doing well'" otherwise.  _Chandola_, 180 Wn.2d at 645 (reiterating a court is

13

not required to "'wait for actual harm to accrue before imposing restrictions'") (quoting *Katare*, 175 Wn.2d at 36).

We also hold that the court's findings on RCW 26.09.191(3) restrictions are affirmatively supported by the record. For example, Wheeler testified that Khanlarova's "deficit in her ability to effectively regulate her emotions and behavior" as well as "rigid, inflexible thinking" results in behavior that is "very extreme and problematic, and potentially very harmful for the children." She added that one "way that this pattern is harmful to the children is that among the extreme behavior that [Khanlarova] engaged in to try to protect them from what she perceived as a threat, was her cutting them off from adults who were otherwise very significant supportive, loving adults in their lives, mainly their grandmother Grace Ellen, their [aunt], and the nanny."

Further, Wheeler testified Khanlarova's actions such as "yelling, raised voices, all those kinds of conflict-related behaviors. Children – particularly young children – preverbal children are very significantly impacted by conflict" that was "in part, between their parents, but largely [Khanlarova] becoming upset seemed to be the primary dynamic." Wheeler observed the children start "to be more aggressive verbally and physically themselves because that's what's being modeled for them, those kinds of authoritarian techniques." Coluccio further testified R.C. started mimicking Khanlarova's behavior such as slamming doors, throwing items, or pounding his fists.[6]

---

[6] Despite the above, Khanlarova's briefing claims a commissioner terminated a restraining order "on December 21, 2022 because [Coluccio]'s allegations of harm to the children were inconsistent with his subsequent conduct and behavior.").

For the reasons above, we hold Khanlarova failed to demonstrate the court's findings lacked substantial evidence or that the imposition of RCW 26.09.191(3) restrictions was a decision "no reasonable judge would have reached." *A.T.*, 11 Wn. App. 2d at 162; *Kim*, 179 Wn. App. at 240.

3. Property Division

Washington courts "use a three-pronged analysis for disposing of property when such a marital-like relationship ends: (1) determine whether a CIR existed; (2) if a CIR existed, evaluate each party's interest in the property acquired during the relationship; and (3) make a just and equitable distribution of that property." *In re the Committed Intimate Relationship of Amburgey*, 8 Wn. App. 2d 779, 787, 440 P.3d 1069 (2019). We addressed the first prong in upholding the court's CIR start date and now turn to the second and third prongs.

In Washington, "we limit the distribution of property following a [CIR] to property that would have been characterized as community property had the parties been married." *Connell*, 127 Wn.2d at 350. "The legislature defines separate property as property acquired before marriage or acquired after marriage by gift, bequest, devise, or descent." *In re Marriage of Chumbley*, 150 Wn.2d 1, 5, 74 P.3d 129 (2003) (citing RCW 26.16.010, .020).

Washington courts employ a rebuttable "presumption that property acquired during a CIR belongs to both parties." *Kelly*, 170 Wn. App. at 734. "The party

Even assuming Khanlarova characterizes the commissioner's actions correctly, "[s]o long as substantial evidence supports the finding, *it does not matter that other evidence may contradict it*" as we defer to the trial court's credibility and weight determinations. *In re Marriage of Burrill*, 113 Wn. App. 863, 868, 56 P.3d 993 (2002) (emphasis added).

asserting that an asset acquired during the CIR is separate property . . . must present 'clear, cogent, and convincing evidence that the asset falls within a separate property exception.'" *Morgan v. Briney*, 200 Wn. App. 380, 390, 403 P.3d 86 (2017) (quoting *Burgess v. Crossan*, 189 Wn. App. 97, 103, 358 P.3d 416 (2015); *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) ("Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable'") (internal quotation marks omitted) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

"The party cannot meet this burden by 'mere self-serving' declarations that the partner 'acquired it from separate funds and a showing that separate funds were available for that purpose.'"[7] *Morgan*, 200 Wn. App. at 390 (quoting *Berol v. Berol*, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950)). Rather, the "party must be able to trace the funds 'with some degree of particularity.'" *Id.* (quoting *Berol*, 37 Wn.2d at 382).

This evidence need not be an "exhaustive accounting" or "irrefutable." *In re Marriage of Schwarz*, 192 Wn. App. 180, 215, 217-18, 368 P.3d 173 (2016) (reiterating also that "'clear and convincing'" evidence requires a "proposition [be]

---

[7] In challenging the court's property division, Khanlarova repeatedly argues Coluccio's testimony was "self-serving" with little elaboration or specific citation to the record. These generalized assertions are contrary to the record as Coluccio introduced more than merely his own testimony, such as ample financial records as well as the testimony and reports of two financial experts. *See Marriage of Schwarz*, 192 Wn. App. 180, 214-15, 368 P.3d 173 (2016) ("[i]t is reasonable to require the party's testimony to be supported by, e.g. documentary evidence . . . or the testimony of another witness."). And again, this evidence need not be an "exhaustive accounting" or "irrefutable," it need only be clear and convincing. *Id.* at 217-18.

highly probable."). Further, "the testimony of a *single* credible witness can qualify as clear and convincing evidence, *even if the witness's testimony is contradicted by other witnesses*." *Id.* at 214 (emphasis added). And it "is reasonable to require the party's testimony to be supported by, e.g., documentary evidence, an admission by their party-opponent, or the testimony of another witness." *Id.* at 214-15.

Here the court largely adopted Coluccio's proposed characterization and division of the property.[8] Under this division, Coluccio received $4.6 million in separate property and $804,000 in community property. The value of separate property awarded to Coluccio does *not* appear to include SolTerra Capital which is valued at negative $3.069 million. Khanlarova received $155,000 in separate property and $1.7 million in community property.

In challenging these decisions, Khanlarova presents two overarching arguments. First, she argues the court failed to properly categorize the divided properly "because it did not make any findings about the acquisition date of any assets acquired before or during the CIR." Second, she argues the court "did not require [Coluccio] to prove with clear and convincing evidence that property acquired during the CIR . . . was his separate property." We address each argument and their in turn below.

a. The Court's Property Categorization

Khanlarova's first argument takes an overly narrow view of the court's

---

[8] A key difference between Coluccio's proposal and the court's division is the latter declined to impose Coluccio's proposed marital lien which would have split the community property 50/50 among the parties.

findings. For example, the court found that Coluccio "paid a large portion of the community expenses over the course of the relationship" and that "the vast majority of [Coluccio's] income across the relationship came from business ownership interests," i.e., Halogent "that *predated the CIR*." (Emphasis added.) Further, Coluccio's "modest supplemental income from related work on that business *during the relationship* was accounted for separately." (Emphasis added.) Thus, while the court's finding may not have specified the *exact* date of acquisition, it still sufficiently described whether the funds originated from sources before or during the CIR.

Khanlarova argues that "[w]ithout findings about the acquisition date, the court was required to presume that all the assets the parties had at the time of trial were acquired during the CIR and therefore were community property." However, both of Khanlarova's cited authorities merely reiterate the general community property standard and do not specifically require the court's findings take a certain form such as specifying the *exact* acquisition date. *Chumbley*, 150 Wn.2d at 5-6; RCW 26.16.030. Such a rigid requirement would needlessly constrain or complicate CIR dissolutions where it is established property was acquired before a CIR but the exact date of acquisition is no longer known or ascertainable. We decline to create such a requirement.

b. The Court's Property Division

Khanlarova again next argues the court "did not require [Coluccio] to prove with clear and convincing evidence that property acquired during the CIR . . . was his separate property." In so arguing, she challenges the court's admission of the

18

documents generated by Coluccio's experts, as well as more globally the court's overall division of investments, the Bellevue home, and retirement accounts. We address each piece of property in turn below.

As a preliminary note, two key facts are undisputed on appeal. First, the parties have never shared bank accounts or joined finances. Second, Coluccio's ownership interest in Halogent, a cosmetic company founded in 2001, predates the CIR.

i. Admissibility of Exhibit 149

Before challenging the division of specific pieces of property, Khanlarova generally argues that "the testimony and reports of [Coluccio]'s expert witnesses are insufficient to prove separate property" as "[m]ost of the information they relied on was not admitted into evidence such as [Coluccio]'s tax returns." Khanlarova only specifically and substantively challenges Exhibit 149[9], which acted as a "'summary report' of [Coluccio]'s tax returns." She argues "[e]xpert witness testimony alone about tax documents without the actual tax documents admitted into evidence is hearsay and inadmissible."

At trial, however, immediately prior to the court admitting Exhibit 149, Khanlarova stated she had "no problem with this report," and even further described it as "the least of [her] concerns" despite the court questioning her about

---

[9] In passing, Khanlarova also alludes to "the 60+ individual line items in the Asset and Debt spreadsheet" which she claims the court adopted while impermissibly "allow[ing] Coluccio to testify that the property was separate without proving it." However, she presents this argument without any direct citation and analysis of the record or Coluccio's actual testimony. *Fishburn v. Pierce County Planning & Land Servs. Dep't*, 161 Wn. App. 452, 468, 250 P.3d 146 (2011) (courts will not comb the record to find support for an appellant's arguments).

its contents. At oral argument, Khanlarova's appellate counsel conceded that Khanlarova did not object to admitting Exhibit 149 below.[10] Wash. Ct. of Appeals oral argument, *In re Committed Intimate Relationship of Coluccio*, No. 86399-1-I (Apr. 9, 2025) at 3 min., 1 sec. through 3 min., 9 sec. *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025041226/?eventID=2025041226.

"'Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike is made.'" *Hamblin v. Castillo Garcia*, 23 Wn. App. 2d 814, 838, 517 P.3d 1080 (2022) (alteration in original) (quoting ER 103(a)(1)); *Boyd v. Kulczyk*, 115 Wn. App. 411, 416-17, 63 P.3d 156 (2003) ("we have no decision of the trial court to review" because the party "raised no objection to [the] testimony on the basis" they now assert on appeal). "While exceptions exist, including for manifest errors implicating a constitutional right, RAP 2.5(a)(3)," no such error or basis has been sufficiently alleged here. *Faust v. Albertson*, 167 Wn.2d 531, 547, 222 P.3d 1208 (2009).[11]

---

[10] After oral argument before this court, Khanlarova submitted pro se materials disputing her counsel's concession and argued she objected "repeatedly" to Coluccio's "expert reports." To the extent Khanlarova attempted to supplement the record, such actions are barred outside the requirements of RAP 9.10 and RAP 9.11. To the extent Khanlarova cited to the record, such as the trial transcript, her citations do not negate her clear refusal to object to or otherwise dispute Exhibit 149 soon before its admission, discussed above. *See also State v. Roosma*, 19 Wn. App. 2d 941, 950, 498 P.3d 59 (2021) ("defense counsel expressly said, 'No objection' when the State offered the text messages at trial, effectively withdrawing the defense's previous objection" and thus "waiv[ing] his challenge to the admissibility of the text messages.").

[11] A declaration Khanlarova filed alongside her motion for reconsideration referenced a "hearsay" issue within a "valuation report." However, a "request for

Courts are "under no obligation to grant special favors to . . . a pro se litigant." *In re Marriage of Olson*, 69 Wn. App. 621, 626, 850 P.2d 527 (1993). Thus, we hold Khanlarova failed to preserve her hearsay arguments concerning Exhibit 149 due to her express refusal to object prior to its admission at trial.[12]

### ii. Division of Investments

In challenging the division of the parties' investments, Khanlarova first merely reiterates her above addressed arguments on Coluccio's expert witnesses and hearsay. Khanlarova then argues that the court's division lacked sufficient evidence and failed to apply the clear and convincing standard. In so arguing, Khanlarova only cites to Kessler and Winkler's testimony that investments are "*generally* split down the middle" but offers little analysis of the actual property at issue.

At trial, the court received evidence Coluccio transferred the proceeds from the Halogent sale to his MJC Holdings Account. Coluccio estimated that community-like expenses surpassed his salary by at least $971,000. In other words, "all of [his] income – all of [his] community earnings were used up times ten for community expenses to support [Khanlarova], the household, et cetera. The rest was used to either buy investments or invest in commercial real estate." In

---

'reconsideration' under CR 59 is not a time to suddenly propose a new theory of the case." *Wash. Election Integrity Coal. United v. Schumacher*, 28 Wn. App. 2d 176, 204, 537 P.3d 1058 (2023).

[12] Khanlarova's appellate brief nonetheless cites comments from Coluccio's attorney earlier at trial describing Exhibit 149 as "illustrative." However, the court's actual admission of Exhibit 149 did not expressly or specifically limit it to only illustrative purposes. Even assuming Exhibit 149 was admitted solely for illustrative purposes, "in a bench trial, the court is presumed to disregard improper evidence when making its findings." *Katare*, 175 Wn.2d at 31-32, 40 n.8.

turn, the remaining funds for these investments solely originated from Halogent proceeds which is separate property. *In re Witte's Estate*, 21 Wn.2d 112, 126, 150 P.2d 595 (1944) ("when the community property is inconsiderable in comparison with the separate property, the mass remains separate property").

Khanlarova's briefing also does not specifically dispute the lack of evidence indicating Halogent increased in value between the start of the CIR in March 2014 and when Coluccio sold his interest in September 2015.

We thus hold the record provides evidence that it is "highly probable" Coluccio's investments originated solely from his separate property funds, i.e., Halogent. *Schwarz*, 192 Wn. App. at 217-18.

### iii. Division of Bellevue Home

For the Bellevue home, the court reimbursed both parties for their initial down payments adjusted for the home's increase in value. The court then evenly split the remaining equity in the home between the parties.

Khanlarova argues that "$361,000 of the $611,000" from Coluccio's down payment "came out came out of his American Express (AmEx) savings account, but he only provided statements to the court going back to November 2015, over a year and half after the CIR began." We disagree as these funds were traceable back to Coluccio's Halogent proceeds.

In September 2015, Coluccio deposited the Halogent sale proceeds in his MJC Holdings account. Later the same month, he transferred a portion of the proceeds to a Bank of America (BofA) account. In October, Coluccio transferred a portion of the proceeds to another BofA account. Later the same month, he

transferred a portion of the proceeds to his AmEx savings account. In December 2016, Coluccio's AmEx account statements show withdrawals consistent with his contribution towards the down payment.

Thus, while "an exhaustive accounting" is not required, we hold the above is evidence sufficient to show it is at least "highly probable" that Coluccio's down payment on the Bellevue home is traced and sourced from his separate Halogent proceeds. *Schwarz*, 192 Wn. App. at 217-18.

### iv.  Division of Retirement Accounts

In challenging the court's division of the retirement accounts, Khanlarova essentially argues the evidence contains a gap for contributions between the court's imposed CIR start date in 2014 and 2016 which Deis used as the start of the parties' "cohabitation" in her retirement account summary. In turn, Deis only characterized contributions after that 2016 date as community-like. Even if the above indicates error, remand is only required where

> (1) the trial court's reasoning indicates that its division was significantly influenced by its characterization of the property, and (2) it is not clear that had the court properly characterized the property, it would have divided it in the same way. In such a case, remand enables the trial court to exercise its discretion in making a fair, just and equitable division on tenable grounds, that is, with the correct character of the property in mind.

*In re Marriage of Shannon*, 55 Wn. App. 137, 142, 777 P.2d 8 (1989); *In re the Meretricious Relationship of Sutton*, 85 Wn. App. 487, 492, 933 P.2d 1069 (1997) (holding that if there is "a rational basis for the court's decision . . . we will not overturn [the] discretionary decision" of distributing property, which is essentially the equivalent of the abuse of discretion standard).

23

Here, the court adopted Coluccio's proposed property division. Under this division, Khanlarova received $452,914 in retirement funds while Coluccio received $35,853.

In adopting the above, the court found this division was more generous than what Washington law would otherwise require and equitable considering the respective financial positions of the parties. After all, a key purpose of CIRs are ensuring that "one party is not unjustly enriched at the end of such a relationship." *Connell*, 127 Wn.2d at 349. Two key considerations here include Khanlarova receiving the vast majority of funds from retirement accounts and Coluccio covered the vast majority of relationship expenses during the CIR, totaling at least $971,754.

The court also indicated it was aware of the 'gap' between the Deis summary and its 2014 start date and had previously heard Khanlarova assert her concerns on the matter.

Thus, we hold the court's division was neither "significantly influenced by its characterization" and that an under an alternative characterization "it would have divided [the accounts] in the same way." *Shannon*, 55 Wn. App. at 142. We further hold Khanlarova failed to establish the court abused its discretion here or within the broader property division discussed above. *Muridan*, 3 Wn. App. 2d at 55-56 (holding that CIR property distributions, which necessarily requires determining when a CIR existed, are reviewed for abuse of discretion).

B.    Failure to Accommodate Claim

24

Khanlarova proceeded pro se at trial.[13] She now argues the court failed to accommodate her as "[n]ot once at any pretrial motion or during trial did the trial judge ask [her] about her disabilities or offer her enough time to fairly present her case." Specifically, she claims her trial issues were "compounded by [her] [Attention Deficit Hyperactivity Disorder (ADHD)] and anxiety," meaning the court provisioning "[e]qual time for the parties equate[d] to unequal treatment because [Khanlarova]'s disabilities necessarily meant that she could not use her time as effectively." She also claims the court failed to act *sua sponte* to give her "notice of her right to request ADA/GR 33 accommodations and further erred in not accommodating Khanlarova's request for more time." Khanlarova cites primarily to the Americans with Disabilities Act of 1990 (ADA), Pub. L. No. 101-336, 104 Stat. 327 (42 U.S.C. 12101), Washington's GR 33, and the Code of Judicial Conduct (CJC).[14]

While pro se parties are held to the same standard as attorneys, *Westberg v. All-Purpose Structures, Inc.*, 86 Wn. App. 405, 411, 936 P.2d 1175 (1997), a division of this court has held that pro se parties with disabilities should not be held to the standard of an attorney if they "suffer[] from a significant mental disability," such that they are "'arguably incapable of understanding the law and legal proceeding.'" *Carver v. State*, 147 Wn. App. 567, 575, 197 P.3d 678 (2008)

---

[13] Multiple attorneys had represented Khanlarova before she opted to represent herself at trial.

[14] Khanlarova's assignments of error also mention the Washington Law Against Discrimination and section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355, 394, but she fails to present any substantive argument for either authority. Thus, we need not address either authority. *Palmer*, 81 Wn. App. at 153.

(involving a pro se party with dementia) (quoting *Cruz v. Root*, 932 F. Supp. 66, 70 (W.D.N.Y.1996)); *In re Marriage of Gharst*, 25 Wn. App. 2d 752, 759, 525 P.3d 250 (2023) (involving a party who suffered a brain injury from multiple strokes).

Starting with the ADA, Khanlarova cites caselaw, albeit at a high level, to argue that a court is required act *sua sponte* to inform her of her right to request accommodations.  It is true that Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[15]  42 U.S.C. § 12101(b)(1).  However, none of the cases Khanlarova cites require a court act *sua sponte*.  *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1130, 1139 (9th Cir. 2001) (holding that the disabled party still needed to "alert[] the public entity to his need for accommodation" although he requested a "videotext display" because he was hard of hearing); *see also In re Marriage of McCann*, 4 Wn. App. 2d 896, 913, 915, 424 P.3d 234 (2018) (explaining GR 33(e) only expressly requires ADA notice in the event of a denial).  Thus, we reject Khanlarova's generalized reliance on the ADA.

Khanlarova next relies on GR 33, which defines "'[a]ccommodation'" as ensuring "each court service, program, or activity when viewed in its entirety" be "readily accessible to and usable by a person with a disability."  Even so, GR 33(b)(4) and (5) still require a spoken or written accommodation request include "a

---

[15] The ADA further defines "disability" broadly to cover any "physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(1)(A).  This definition includes "[a]ny mental or psychological disorder such as . . . emotional or mental illness," "specific learning disabilities" such as "Attention Deficit Hyperactivity Disorder" (ADHD), and "post-traumatic stress disorder" (PTSD), among others.  28 C.F.R. § 35.108(b)(1)(ii), (b)(2), (d)(2)(iii)(K).

description of the accommodation sought, along with a statement of the disabilities necessitating the accommodation." In other words, "GR 33 requires proof of disability as a prerequisite to accommodations at trial." *McCann*, 4 Wn. App. 2d at 909. Thus, a party must both request specific accommodations and sufficiently establish their disabilities.[16] We review application of a court rule such as GR 33 de novo. *Niccum v. Enquist*, 175 Wn.2d 441, 446, 286 P.3d 966 (2012).

Here, Khanlarova's briefing does little to establish the above two-step analysis, i.e., that she requested specific accommodations and established her disability at trial. At most, Khanlarova argues she "told the court about" her ADHD and that Dr. Wheeler's testimony and reports referenced ADHD. Khanlarova otherwise provides no citation to the record where she specifically asked for particular GR 33 accommodations connected to her ADHD.

GR 33 also does not require a court always act *sua sponte* as Khanlarova now claims. GR 33(e) only states that, "*[i]f a requested accommodation is denied*, the court shall specify the reasons" and "also ensure the person requesting the accommodation is informed of their right to file a complaint under the [ADA]."

---

[16] This court has consistently so held in numerous unpublished opinions. *See, e.g.*, *Rogers v. Rushford*, No. 49598-8-II, slip op. at 12 (Wash. Ct. App. Mar. 6, 2018) (unpublished) https://www.courts.wa.gov/opinions/pdf/D2%2049598-8-II%20Unpublished%20Opinion.pdf (holding the party's request was insufficient as she merely "referenced her disability in the context of asking the superior court" for the ultimate relief she sought); *In re Parentage and Support of H.N.C.*, No. 57694-5-II, slip op. at 34 n.10 (Wash. Ct. App. Oct. 15, 2024) (unpublished) https://www.courts.wa.gov/opinions/pdf/D2%2057694-5-II%20Unpublished%20Opinion.pdf (noting "although Curry referenced her ADHD and PTSD, she did not make any request for accommodation under GR 33"). Both of the above opinions are "necessary for a reasoned decision" as they provide on-point examples of insufficient GR 33 requests. GR 14.1(b).

(emphasis added); *see also McCann*, 4 Wn. App. 2d at 913 (same). In other words, a duty to notify a party of their ADA rights is triggered only if the party makes an adequate GR 33 request and the request is denied.

Regardless, the record also demonstrates the court repeatedly attempted to assist Khanlarova during trial. For example, at the beginning of trial, the court explained it was "going to allocate nine hours of time to each side," but that it would still "tr[y] to build in some flexibility because, of course, there's going to be issues like the ones we've already had come up," in reference to a previous discussion on evidentiary issues. And, true to the court's word, it repeatedly went beyond its normal schedule to accommodate the issues that arose. *E.g.* 3 Rep. of Proc. (RP) at 860 (court ran "well over time" to resolve evidentiary issues), 4 RP at 1418 (court asked everyone to "stay a little bit longer" to remain on schedule).

As the trial proceeded, the court repeatedly attempted to assist Khanlarova with courtroom procedures. *E.g.* 2 RP at 443 (preemptively explained opening statements to Khanlarova), 3 RP at 600 (helped Khanlarova frame her questions to witnesses), 3 RP at 614-16 (answering Khanlarova's evidentiary questions), 4 RP at 1165 (assisting her with admitting exhibits), 3 RP at 622 ("I'm trying to give [Khanlarova] a little bit of leeway here to understand what the point is before the Court takes any action. So I'm just giving [Khanlarova] a chance."), 4 RP at 1295-97 (explaining to Khanlarova why it sustained an objection), 5 RP at 1662-63 (again answering Khanlarova's evidentiary questions), 5 RP at 1689-90 (admitting Khanlarova's evidence, albeit for a limited purpose, despite apparent hearsay issues), 5 RP at 1766-68 (answering Khanlarova's concerns about whether

28

specific exhibits were admitted), 5 RP at 1775-78 (attempting to address Khanlarova's concerns on admitting text messages despite her failure to comply with an earlier order).

Thus, we hold this matter is unlike matters where a disabled pro se party was improperly denied the opportunity to argue the merits of their claims. *Carver*, 147 Wn. App. at 571, 575 (holding the court improperly dismissed the claim of a pro se litigant with dementia on collateral estoppel); *Gharst*, 25 Wn. App. 2d at 754, 759 (holding the court improperly denied a party's CR 60(b) motion following their failure to appear due to their brain injury from a series of strokes). Instead, even if she had the type of disabilities present in those cases, Khanlarova had ample opportunity to argue her case on the merits and the court repeatedly attempted to assist her throughout.

As a final note, Khanlarova also repeatedly invokes the CJC, specifically comment 4 to CJC 2.2 and comments 4.1 and 4.14 to CJC 2.6. First, while comment 4 to CJC 2.2 generally describes a court's ability to make "reasonable accommodations to ensure an unrepresented litigant's right to be heard," it expressly states it "does not require a judge to make any particular accommodation." Second, while comment 4 to CJC 2.6 similarly states that a court "should endeavor to ensure unrepresented litigants have a fair opportunity" to present their case, it also expressly states the various ways a court could accommodate a litigant are "not required." *See* Comment 4.1 to CJC 2.6 ("[i]dentifying and providing resource information"); *see also* Comment 4.14 to CJC 2.6 ("[c]larifying with the parties whether they have presented all of their evidence"

29

before closing evidence).  Thus, we hold Khanlarova's reliance on the CJC is also inapposite.

For the reasons above, we hold Khanlarova's assignment of error fails.

C.    Attorney Fees

In her briefing, Khanlarova sought fees on appeal under RCW 4.84.330, RAP 14.2, and RCW 26.09.140.  But RCW 4.84.330 and RAP 14.2 require the party "prevail" in the action to receive fees, which Khanlarova does not here.  And this court previously held that parties to CIR proceedings are not entitled to fees under RCW 26.09.140.  *Foster v. Thilges*, 61 Wn. App. 880, 887-88, 812 P.2d 523 (1991).  Thus, each initial claimed basis fails.

At oral argument, Khanlarova's appellate counsel "clarified" her fee request was solely based on their challenge to RCW 26.09.191(3).[17]  Wash. Ct. of Appeals oral argument, *supra* at 20 min., 25 sec. through 21 min., 1 sec.  We reject Khanlarova's fee request as we uphold the court's RCW 26.09.191(3) restrictions against her.[18]

---

[17] After oral argument before this court, Khanlarova pro se filed a statement of additional authorities under RAP 10.8, claiming she also sought appellate fees "under RCW 4.84.185, CR 11, RCW 4.84.190, and the equitable doctrine."  This is an improper use of RAP 10.8.  *See M.G. v. Bainbridge Island Sch. Dist. #303*, 34 Wn. App. 2d 51, 69 n. 19, 566 P.3d 132 (2025) ("'We view [RAP 10.8] as being intended to provide parties an opportunity to cite authority decided after the completion of briefing. We do not view it as being intended to permit parties to submit to the court cases that they failed to timely identify'" or "raise[] arguments they could have raised, but failed to raise, in [their original] brief.") (quoting *O'Neil v. City of Shoreline*, 183 Wn. App. 15, 23, 332 P.3d 1099 (2014)).

[18] Khanlarova also assigns error to the trial court's orders requiring she reimburse Coluccio for Wheeler's fees and "that each party should pay their own fees and costs."  Khanlarova's briefing mentions these two orders in passing but fails to offer any substantive argument on them.  Thus, we need not consider these arguments further.  *Palmer*, 81 Wn. App. at 153.

### III.    CONCLUSION

We affirm the trial court's final orders and deny Khanlarova's request for attorney fees.

_Díaz, J._

WE CONCUR: